Jonathan Shub (SBN 237708)
Samantha E. Holbrook (*pro hac vice* forthcoming)
Andrea L. Bonner (*pro hac vice* forthcoming)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
*jshub@shublawyers.com*
*sholbrook@shublawyers.com*

*Attorneys for Plaintiffs and the Class*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARJANIQUE ROBINSON and
ARIANA SKURAUSKIS, individually and
on behalf of all similarly situated persons,

        Plaintiffs,

    v.

JC PENNEY COMPANY, INC. a
Delaware corporation and PENNEY OPCO
LLC, a Virginia limited liability company,

        Defendants.

Case No. 3:24-cv-06243

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs Marjanique Robinson ("Robinson") and Ariana Skurauskis ("Skurauskis") (collectively, "Plaintiffs") bring this class action complaint individually and on behalf of all others similarly situated against Defendant Old COPPER Company, Inc. f/k/a J. C. Penney Company, Inc. ("Old Copper") and Defendant Penney OpCo LLC ("Penney OpCo") (collectively, "Defendants" or "JC Penney"). The allegations contained in this class action complaint are based on Plaintiffs' personal knowledge of facts pertaining to themselves and upon information and belief, including further investigation conducted by Plaintiffs' counsel, as to the remainder.

## I.    NATURE OF THE ACTION

1.    Advertised "sale" prices are important to consumers. Consumers are more likely to purchase a product if they believe that they are getting a good deal or purchasing that item at a "bargain" price. Further, if consumers believe that the reduced price will end soon, they are more likely to buy now, rather than wait or comparison shop, and buy something else. (*See*, Ngwe, Donald, "Fake Discounts Drive Real Revenues in Retail," Harvard Business School Working Paper (2018), at 1-2.)

2.    While legitimate sales are entirely proper and legal, deceptive sales—i.e. "sales" with fictitious original or former prices, made-up discounts, and made-up expirations—are misleading and illegal.

3.    This is an action against Defendants for false reference pricing on their website, www.jcpenney.com (the "Website").

4.    By way of background, a marketing strategy that businesses often use to promote sales is known as "strikethrough pricing" or "false reference pricing," whereby a seller advertises the "former" price of a product, which is then crossed out and replaced with a purportedly "discounted" price, either next to the stricken price or revealed after a consumer adds the item to his or her online shopping cart. Such schemes have at least two purposes: (1) to induce consumers to make a purchase under the false belief that they are getting a bargain, and (2) to create a false sense of urgency that the purported "sale" will end and then the consumer will have to pay the "full" price for the item. In reality, however, the consumer is not getting a bargain—he is simply buying it at or

around the prevailing market price—and the "sale" is perpetual because the lower "sale" price rarely, if ever, returns to the higher "former" price.

5.    False reference pricing violates state and federal law. Yet, sellers, including Defendants, continue to engage in this tactic because they know they will be able to increase sales and profits by tricking consumers into making purchasing decisions based on the advertised reference prices. Consumers generally lack full information about products because the information available to consumers varies for different types of products. Thus, consumers are left to rely on sellers and their pricing disclosures to make their purchasing decisions.

6.    To illustrate, below is a screengrab from Defendants' Website for the Loom + Forged Rouched Throw Blanket purchased by Plaintiff Skurauskis on September 20, 2021, which has a "former" (strikethrough or false reference) price of $90.00. Ms. Skurauskis added the item to her cart and purchased the blanket at a "sale" price of $44.99.



Loom + Forge Rouched Throw
**$44.99** *with code* ~~$90~~
★★★★★ 5

7.    However, as explained further herein, it appears that Defendants *never* advertised or sold this item for $90.00 in the three months before Ms. Skurauskis

purchased it on September 20, 2021.[1] That is, the price at which Defendants actually sold this item fluctuated between $44.99 (a 50% "discount") and $67.50 (a 25% "discount") the entire time, meaning the $90.00 "former" price was fake and the 25-50% "discount" was also fake.

8.    The creation of a fake "sale" or "discount" creates a false sense of urgency which induces customers to purchase the item out of concern that the non-existent "sale" will end and they will lose out on the "discount," meaning many consumers forego waiting until that item *actually* goes on sale. Based on Defendants' representations, Plaintiffs believed that they were purchasing products for which the regular price and market value was the purported "regular" or "former" price that Defendants advertised, that they were receiving a substantial discount, and that the opportunity to get that discount was seemingly time limited. These reasonable beliefs were what led Plaintiffs to buy from Defendants when they did.

9.    In reality, however, Defendants' represented prices were not true. The purported "regular" prices were not the true regular prices, the purported "discounts" were not the true discounts, and the "discounts" were not necessarily time limited.

10.    This conduct artificially increases demand for the deceptively priced products and induces customers to pay more based on an impression of the products' falsely inflated value.

11.    The products at issue include all goods that have at any time been offered by Defendants, either on their Website or at one of Defendants' store locations, at a sale or discounted price from a higher "former" or "regular" price, including, but not limited to: apparel, home, jewelry, and beauty products.

12.    Consumers who visit Defendants' Website and buy an item on "sale" from a stricken former or "reference" price are being misled by Defendants. This is because that item has not been advertised for sale or sold, during the relevant statutory period,

---

[1] The "prevailing market price" of a product sold exclusively by one retailer is the price of the product at which the retailer offered that product over the three months immediately preceding the advertisements. Cal. Bus. & Prof. Code § 17501; *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 525 (C.D. Cal. 2015).

CLASS ACTION COMPLAINT

at the former price. Defendants' use of inflated reference prices, strikethrough pricing and "discounting," and purported limited time sales, all lead reasonable consumers to believe that the products in fact had been listed for sale and sold by Defendants at the former price, during, at a minimum, the relevant statutory period, or for a substantially longer period of time.

13.     On information and belief, all or nearly all the strikethrough prices on Defendants' Website and in their stores are false and misleading. They are not former or "regular" prices at which the products were offered for sale in the relevant statutory period or for a substantial time, if at all. They are inflated prices advertised to entice consumers into purchasing items from Defendants.

14.     Moreover, as shown below, Defendants frequently advertise purported "sales" with end dates to lead consumers to believe such "sales" will end and the prices for the items being offered at a discount during the sale period will revert to the inflated reference prices when the sale ends.



In reality, however, all or nearly all of the items remain substantially discounted after the purported sale's end date, i.e., none or almost none of them items revert back to the

reference prices advertised by JC Penney. This is intended to create a false sense of urgency and prompt consumers to make purchases they would not have otherwise made.

15.     In addition, on information and belief, even when Defendants do not advertise a certain end date to their purported sales, Defendants frequently advertise sales with deep discounts that reasonable consumers would reasonably believe are limited in duration because the items appear to be marked down so significantly that no reasonable consumer would believe that such "sales" would continue indefinitely.

16.     Reasonable consumers reasonably believe that the "regular" prices Defendants advertise represent the true market value of the products and are the prevailing prices for those products, and that they are receiving reductions from those "regular" prices in the amounts advertised. Accordingly, when consumers purchased these products at a manufactured "discounted" price, consumers did not receive the product they believed they received at full value and purchased at a discount. To illustrate, assume a consumer is willing to purchase an item for $35. But to motivate consumers psychologically, and thus increase revenue and capture market share, the company advertises the product as having a "regular" price of $80 and being on "sale" at 50% off (i.e., $40 off). Because consumers value products based on the false reference price, a product falsely advertised at 50% off leads the consumer to believe he is getting an item worth $80 for $40. The consumer thinks he is getting a good deal, but he has been fleeced because he actually paid $5 more for the item that he otherwise would have been willing to pay due to Defendants' psychological manipulation regarding the "regular" price or value of the item. The misrepresentation also creates a false sense of urgency. Thus, consumers make purchases they would not otherwise have made.

17.     As a result of this psychological baiting, consumers are not only deceived into spending money they otherwise would not have spent, but also purchasing items they would not have purchased, and spending more money for an item than they otherwise would have, had Defendants not engaged in false advertising.

18.     Consumers also rely on retailers to provide accurate reference prices. For infrequently purchased luxuries such as home appliances, decor, or jewelry, consumers

CLASS ACTION COMPLAINT

do not have reference points to gauge accurate pricing. Deception is likely to be greater in this context due to a lack of pricing knowledge.

19.     The damage to any single consumer in any single transaction related to the purchase of a single item may seem relatively small. However, when multiplied by millions of sales transactions over the course of several years, Defendants deceptively and unlawfully walk away with tens, if not hundreds, of millions of dollars in additional revenue compared to a business model that does not employ such deceptive advertising practices. The enhanced revenue likely explains why Defendants have a long history of engaging in false reference pricing despite the fact that in the last decade they have acknowledged the unlawfulness of the practice and have been sued for such practices repeatedly. *See Infra* Section IV.H.

## II.     PARTIES

### Plaintiffs

20.     Plaintiff Marjanique Robinson is a resident of the State of California and County of Alameda. She was present in Alameda County at the time she made her purchase from Defendants' Website.

21.     Plaintiff Ariana Skurauskis is a resident of the State of California and County of Santa Clara. She was present in Santa Clara County at the time she made her purchase from Defendants' Website.

### Defendants

22.     On information and belief, Defendants operate both JC Penney's stores and ecommerce Website, jcpenney.com, and advertise, market, distribute, and/or sell apparel, home, jewelry, and beauty products throughout the United States, including California.

23.     Old COPPER Company, Inc. f/k/a J.C. Penney Company, Inc. ("JC Penney") was a Delaware corporation with its headquarters located at 6501 Legacy Drive, Plano, TX 75024-3698.[2] JC Penney sold merchandise to consumers through

---

[2] *See* https://www.naics.com/company-profile-page/?co=5483

CLASS ACTION COMPLAINT

department stores and its e-commerce Website. On May 15, 2020, JC Penney filed for Chapter 11 Bankruptcy, and on December 7, 2020, JC Penney completed the sale of all of its retail and operating assets to Penney OpCo LLC—an entity formed and under the joint control of Simon Property Group, L.P. and Brookfield Asset Management Inc.[3]

24.     Penney OpCo, LLC ("Penney OpCo") is a Virginia limited liability company[4] with its principal executive offices located at 6501 Legacy Drive, Plano, TX 75024-3698.[5] Penney OpCo is a private company doing business as JCPenney outside of the Chapter 11 bankruptcy process.[6] For further context, Penney OpCo LLC is an entity that was formed by and is under the joint control of Simon Property Group, L.P. and Brookfield Asset Management Inc.[7] All retail operations of Old COPPER Company, Inc. ended effective with the sale of its operating assets.[8]

## III.    JURISDICTION & VENUE

25.     This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are at least 100 Class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one putative class member and one Defendant are citizens of different states.

26.     This Court also has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy in this case exceeds $75,000 and this action is between citizens of different states. Plaintiffs are residents of California whereas Defendants are Virginia and Delaware entities with their principal

---

[3] *See J.C. Penney Company, Inc. – Investor Relations*, https://www.loc.gov/item/lcwaN0016642/#:~:text=Summary,and%20Brookfield%20Asset%20Management%2C%20Inc

[4] https://cis.scc.virginia.gov/EntitySearch/BusinessInformation?businessId=11128073&source=FromEntityResult&isSeries%20=%20false

[5] *See Penney OpCo LLC – Company Profile*, https://www.globaldata.com/company-profile/jc-penney-company-inc/

[6] *See J.C. Penney Company, Inc. – Investor Relations*, https://www.loc.gov/item/lcwaN0016642/#:~:text=Summary,and%20Brookfield%20Asset%20Management%2C%20Inc

[7] *Id.*

[8] *Id.*

CLASS ACTION COMPLAINT

places of business in Texas.

27.    Defendants are subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including Defendants' marketing to Plaintiffs, sales to Plaintiffs, and Defendants' ownership and operation of approximately 63 stores within the State of California. Accordingly, Defendants have sufficient minimum contacts in California to render the exercise of jurisdiction by the California courts consistent with traditional notions of fair play and substantial justice.

28.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants named in this Action transacts business within this district and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## IV.    GENERAL ALLEGATIONS

### A.    Company Background

29.    JC Penney is a department store that was "founded in 1902."[9] JC Penney is "one of the nation's largest retailers of apparel, home, jewelry, and beauty merchandise, [and] JCPenney has a portfolio of private and national brands" as well as "private brands like Liz Claiborne®, Stafford®, okie dokie™, and Worthington™."[10] Furthermore, JC Penney has more than 650 stores in the U.S. and Puerto Rico and is "making the shopping experience easy and seamless across all channels and devices with a mobile-first design of our website, new and innovative in-store experiences and formats, and multiple fulfillment methods such as in-store and curbside pickup, and ship to home."[11]

30.    Defendants, through their Website and in-store, have sold millions of units of merchandise to consumers nationwide.

---

[9] https://www.jcpenney.com/m/company-info
[10] *Id.*
[11] *Id.*

**B.    Defendants' Pricing Scheme Is False and Deceptive Because The Products Are Not Sold at JC Penney at the Former Reference Prices**

31.    Defendants' business model relies on deceiving consumers with false or misleading advertisements.

32.    On any given date, many products at JC Penney are represented as being discounted from a substantially higher reference or former price. On information and belief, products are offered at the same prices both in-store and on JC Penney's Website. On JC Penney's Website, for example, the supposed markdowns are represented to the consumer by prominently displaying a "crossed-out" reference price next to the sale price, which is displayed in bold red font. A representative example is shown below. (For some products, the sale prices are only shown when added to a customer's cart to further incentivize a purchase.)



Mutual Weave Mens Adaptive 8" Chino Short
*DOORBUSTER!*
**$14.99** *sale* *$40*

33.    Defendants employ these deceptive tactics to falsely convey to customers that the product was formerly listed or sold on the Website at the reference price in the recent past and for a substantial period of time, but is now being listed and sold to the customer at a substantial discount.

34.    By way of background, the way false reference pricing is evaluated depends significantly on whether the product is exclusive or non-exclusive. Exclusive

products are products that are sold exclusively by one retailer. The "prevailing market price" of an exclusive product is the price of the product at which the retailer offered that product over the three months immediately preceding the advertisements. Cal. Bus. & Prof. Code § 17501; *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 525 (C.D. Cal. 2015). Thus, if the advertised reference price of the exclusive item exceeds that prevailing market price, then the advertisement is deceptive.[12] *Spann*, 307 F.R.D. at 525. On the other hand, non-exclusive products are products that are sold by multiple retailers. The "prevailing market price" of a non-exclusive product is determined by the prices at which multiple retailers in the market offered that product over the three months immediately preceding the advertisements. Cal. Bus. & Prof. Code § 17501; *Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1085 (C.D. Cal. 2018).

35.    Regardless of whether the item is exclusive or non-exclusive to JC Penney, the higher reference price that Defendants advertise is typically a falsely inflated price because they rarely, if ever, list or sell items at the advertised reference price. The sole purpose of the false reference price is to mislead customers into believing that the displayed reference price is a former or regular price at which Defendants or competitors sold the item in the recent past. As a result, Defendants falsely convey to customers that they are receiving a substantial markdown or discount, thus inducing them to make a purchase before the "sale" ends. Representative examples of such false and misleading advertising, i.e., products having never been sold at the false reference price over the course of several months, are shown below.

1. Made in Italy 14K Gold Over Silver Solid Paperclip Ankle Bracelet

    i.    05/13/2024: $129.99 (sale price), marked down to $97.49 with a "discount code"; $324.98 (former price)

---

[12] For example, "[a] furniture dealer runs [an] advertisement which offers a couch which he claims was formerly selling for $100 but is now selling for $50. Unless the price which he advertises as the former price actually coincides with the "prevailing market price" of the couch within the next preceding three months ... the advertisement is again false and deceptive." *Spann*, 307 F.R.D. at 525 (quoting Attorney General Opinion No. 57–126).



  ii.  12/28/2023: $109.37 (sale price); $324.98 (former price)

  iii.  01/03/2023: $97.49 (sale price); $324.98 (former price)

 2. <u>Loom + Forged Rouched Throw Blanket</u>

  i.  05/15/2024: $34.99 (sale price), marked down to $24.49 with a "discount code"; $90.00 (former price)



  ii.  10/02/2022: $67.50 (sale price); $90.00 (former price)

  iii.  11/7/2021: $44.99 (sale price); $90.00 (former price)

  iv.  08/13/2021: $67.50 (sale price); $90.00 (former price)

 36. On information and belief, as discussed further *Infra* Section IV.H, this is not a new or isolated sales practice by Defendants, but a practice that has continued consistently for years throughout the statutory period and is still ongoing.

 37. These pricing and advertising practices are deceptive and pressure consumers into purchasing products from Defendants at an inflated price out of fear that they will miss out on a limited-time sale. Defendants intend to mislead consumers into believing that they are getting a bargain by buying products from JC Penney on sale and at a substantial discount. Defendants do so with the intention of promoting sales,

increasing sales revenue, and for the purpose of disposing of products that it has in inventory. For many products, Defendants do not offer or sell the products at the reference price for a substantial time, if at all. The reference price is, therefore, artificially inflated, and the advertised discounts are deceptive.

**C.   JC Penney's Intentions Underlying Its False-Reference Pricing Scheme**

38.    Defendants knew or should have known that its use of false reference prices were misleading consumers to believe that they were receiving a "bargain" when they, in fact, were not.

39.    Moreover, Defendants intended for reasonable consumers to understand the "sale" prices to be prices that JC Penney had reduced from JC Penney's "regular" or "former" prices. Defendants intentionally failed to disclose to Plaintiffs and Class members the truth about their reference prices, i.e. that they were fabricated, and that Defendants never offered the items at the reference prices during the relevant statutory period. Defendants intentionally sought to convey to consumers that they were receiving a true markdown.

40.    Defendants intentionally and deliberately implemented a pricing scheme that was designed to mislead its customers to believe that the reference prices it used were: (a) the prices that the advertised product was formerly listed at; and/or (b) the prevailing market rate of the advertised product.

**D.    Plaintiffs' Experiences**

**Plaintiff Robinson's Purchase from the Website**

41.    On December 28, 2023, Plaintiff Robinson visited the JC Penney Website and purchased a "Made in Italy 14K Gold Over  Silver Solid Paperclip Ankle Bracelet" (the "Ankle Bracelet").[13] Based on and consistent with archived copies of the Website,

---

[13] Although Plaintiff Robinson purchased the Ankle Bracelet through JC Penney's Website, Plaintiff Robinson does not have a JCPenney online account, is not a Rewards program member, and used the guest checkout option. Additionally, Plaintiff Robinson Does not have a JCPenney credit card.

CLASS ACTION COMPLAINT

Plaintiff Robinson saw on the listing page a former price of $324.98 which was stricken through. She added the Ankle Bracelet to her cart then proceeded to purchase the product for $109.37 with the understanding that she was receiving all advertised discounts off the former price charged by Defendants. The product was shipped to her address in Alameda County, California.

42.    Plaintiff Robinson relied on the representation of Defendants' reference pricing and believed that the reference price was actually a former price in the marketplace within the statutory period. She relied on the fact that the Ankle Bracelet was discounted, and that she was getting a "deal." This made the purchase more attractive and more urgent. Defendants led her to believe she was getting a discount on an item worth $324.98, but, in reality, this was not the prevailing market price for the statutory period.

43.    That sale was false and misleading. Based on archived copies of Defendants' Website, the product was regularly offered on the Website at a "discounted" price.

A. 05/13/2024: $129.99 (sale price); $324.98 (former price)

B. 01/03/2023: $97.49 (sale price) ; $324.98 (former price)

44.    Plaintiff Robinson thus viewed and relied on the Website's purported then-current and, possibly limited time, "sale." She relied on the above representations that the product (1) had a former price of the advertised strikethrough price, and (2) had been offered for sale *on the Website* at the stated reference price, in the recent past, at least for the statutory period, on a regular basis, and for a substantial time. And she relied on the representations that the product was truly on sale and being sold at a substantial markdown.[14]

45.    Contrary to the message that Defendants tried to convey with strikethrough pricing, the above-listed product that Plaintiff Robinson purchased was not marked

---

[14] The Ankle Bracelet that Plaintiff Robinson purchased was exclusively sold at JC Penney, thus, there are not any other retailers to compare JC Penney's pricing of the Ankle Bracelet to for the purposes of determining the prevailing market price.

down or discounted substantially, and any discount she received had been grossly exaggerated.

46. Moreover, for at least the three-month period prior to Plaintiff Robinson's purchase, and on information and belief months and years more, Defendants very rarely, if ever, offered any of the discounted items sold on the Website at the reference prices.

47. Plaintiff Robinson would not have purchased the item at the advertised price, or would not have paid as much as she did, had Defendants been truthful—she would have waited for the product to *actually* go on sale. Plaintiff Robinson was persuaded to make her purchase because of the misleading sale based on false reference prices.

48. Plaintiff Robinson continues to be interested in purchasing jewelry, clothing, and products that are available for purchase at JC Penney and offered at discounted prices, but she will be unable to trust and rely on Defendants' advertising, and so will not purchase the products from Defendants unless she has assurances that Defendants' deceptive pricing practices have been rectified. Absent injunctive relief, Robinson cannot know whether Defendants' former and regular prices represent honest prices at which the products were listed for sale on the Website, on a regular basis for a reasonably substantial period of time, or if Defendants' false sales practices are perpetual.

**Plaintiff Skurauskis' Purchase from the Website**

49. On September 20, 2021, Plaintiff Skurauskis visited the JC Penney Website and purchased a Loom + Forged Rouched Throw Blanket ("Loom Blanket"). Based on and consistent with archived copies of the Website, Plaintiff Skurauskis saw on the listing page a former price of $90.00 which was stricken through. She added the Loom Blanket to her cart then proceeded to purchase the product for $44.99 with the understanding that she was receiving all advertised discounts off the former price charged by Defendants. The product was shipped to her address in Santa Clara County, California.

50. Plaintiff Skurauskis relied on the representation of Defendants' reference

pricing and believed that it was actually a former price in the marketplace within the statutory period. She relied on the fact that the Loom Blanket was discounted, and that she was getting a "deal." This made the purchase more attractive and more urgent. Defendants led her to believe she was getting a discount on an item worth $90.00, but this was not the prevailing market price for the statutory period.

51.    That sale was false and misleading. Based on archived copies of Defendants' Website, the product was regularly offered on the Website at a "discounted" price.

    a.    05/15/2024: $34.99 (sale price) / $90.00 (former price)

    b.    10/02/2022: $67.50 (sale price) / $90.00 (former price)

    c.    11/7/2021: $44.99 (sale price) / $90.00 (former price)

    d.    08/13/2021: $67.50 (sale price) / $90.00 (former price)

52.    Plaintiff Skurauskis thus viewed and relied on the Website's purported then-current and limited time "sale." She relied on the above representations that the product (1) had a former price of the advertised strikethrough price, and (2) had been offered for sale *on the Website* at the stated reference price, in the recent past, at least for the statutory period, on a regular basis, and for a substantial time. And she relied on the representations that the product was truly on sale and being sold at a substantial markdown.[15]

53.    A screenshot of the product listing dated May 15, 2024 is below. As of that date, the product was still on sale for $34.99, or for $24.99 with a discount code.

---

[15] The Loom Blanket that Plaintiff Robinson purchased was exclusively sold at JC Penney, thus, there are not any other retailers to compare JC Penney's pricing of the Loom Blanket to for the purposes of determining the prevailing market rate.



54.     Contrary to the message that Defendants tried to convey with strikethrough pricing, the above-listed product that Plaintiff Skurauskis purchased was not marked down or discounted substantially, and any discount she received had been grossly exaggerated.

55.     Moreover, for at least the three-month period prior to Plaintiff Skurauskis' purchase, and on information and belief months and years more, Defendants very rarely, if ever, offered any of the discounted items sold on its Website at the reference prices.

56.     Plaintiff Skurauskis would not have purchased the item at the advertised price, or would not have paid as much as she did, had Defendants been truthful—she would have waited for the product to *actually* go on sale. Plaintiff Skurauskis was persuaded to make her purchase because of the misleading sale based on false reference prices.

57.     Plaintiff Skurauskis continues to be interested in purchasing products that are available for purchase at JC Penney and offered at discounted prices, but she will be unable to trust and rely on Defendants' advertising, and so will not purchase the products from Defendants unless she has assurances that Defendants' deceptive pricing practices have been rectified. Absent injunctive relief, Skurauskis cannot know whether Defendants' former and regular prices represent honest prices at which the products were listed for sale on the Website, on a regular basis for a reasonably substantial period

of time, or if Defendants' false sales practices are perpetual.

      **E.**    **Research Shows That Reference Price Advertising Influences Consumer Behavior and Perceptions of Value**

58.    Deceptive pricing practices have drawn the scrutiny and analysis of mainstream media and several academic studies.

59.    Retailers like Defendants can benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get **higher margins**, but also **increase sales**." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. MKTG., 826, 835 (2023) (emphasis added).

60.    Retailers "mark up the prices and then offer seemingly deep discounts to make the deals look more attractive," reports Jie Zhang, a professor of marketing at the University of Maryland. "This is a form of deceptive pricing."[16] This tactic is meant to trick shoppers into thinking they are getting a better price than usual.

61.    Consumers' Checkbook, a nonprofit consumer-advocacy publication, tracked the prices of more than 25 items at 24 major retailers over 33 weeks last year. Researchers concluded that at eight companies, more than half of the items they tracked "were offered at false discounts every week or almost every week we checked."[17]

62.    Luc Wathiue, a professor of marketing at Georgetown University, says that this is an effective technique because shoppers usually aren't tracking prices that closely. "As consumers, we don't know what the right price should be, so we use cues in the environment to determine whether the price that we have in front of us is advantageous."[18]

63.    "By creating an impression of savings, the presence of a higher reference

---

[16] Jaclyn Peiser, *A common, illegal tactic retailers use to lure consumers*, The Washington Post (Nov. 21, 2023), available: https://www.washingtonpost.com/business/2023/11/21/fake-sale-deceptive-pricing/ ("Washington Post Article").

[17] *See id.*

[18] *See id.*

price enhances subjects' perceived value and willingness to buy the product."[19] Thus, "empirical studies indicate that, as discount size increases, consumers' perceptions of value and their willingness to buy the product increase, while their intention to search for a lower price decreases."[20]

64.    "[D]ecades of research support the conclusion that advertised reference prices do indeed enhance consumers' perceptions of the value of the deal."[21] According to academic studies, "[c]onsumers are influenced by comparison prices even when the stated reference prices are implausibly high."[22]

65.    According to Jie Zhang, the "psychological effect works" for tricking consumers into believing that they are receiving a good deal. "It's a very strong and robust effect, so I'm not surprised those retailers actually resorting to this tactic, because time and time again it works."[23]

66.    Another academic journal explains that "[r]eference price ads strongly influence consumer perceptions of value . . . . Consumers often make purchases not based on price but because a retailer assures them that a deal is a good bargain. This occurs when . . . the retailer highlights the relative savings compared with the prices of competitors . . . [T]hese bargain assurances (BAs) change consumers' purchasing behavior and may deceive consumers."[24]

67.    "[R]esearch has shown that retailer-supplied reference prices clearly enhance buyers' perceptions of value" and "have a significant impact on consumer

---

[19] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992). "[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price." *Id.*; Patrick J. Kaufmann et al, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

[20] *Id.* at 56.

[21] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Believe It Or Not*, J. OF CONSUMER AFFAIRS, Vol. 36, No. 2, at 287 (Winter 2002).

[22] *Id.*

[23] Washington Post Article.

[24] Joan Lindsey-Mullikin & Ross D. Petty, *Marketing Tactics Discouraging Price Search: Deception and Competition*, 64 J. OF BUS. RESEARCH 67 (January 2011).

purchasing decisions."[25]

68.   "[R]eference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product."[26] This study also concluded that "consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[27]

69.   According to a OnePoll survey, 67% of respondents said the cost-of-living pressures made them more desperate to find the best deals, and 71% believe they are "saving money" by buying products that are on sale, even if the price reduction is not genuine.[28]

70.   Additionally, a product's "price is also used as an indicator of product quality."[29] In other words, consumers view Defendants' deceptive advertised reference prices as a proxy for product quality.

71.   As such, research confirms that deceptive advertising through false reference pricing is intended to, and, in fact does, influence consumer behavior.  By artificially inflating consumer perceptions of an item's value and causing consumers to spend money they otherwise would not have, consumers purchase items they otherwise would not have, and/or purchase products from a specific retailer believing that they are receiving a "discount."

### F.   Consumers Suffered Economic Harm

72.   Based on Defendants' advertisements, reasonable consumers would expect

---

[25] Praveen K. Kopalle & Joan Lindsey-Mullikin, *The Impact of External Reference Price On Consumer Price Expectations*, 79 J. OF RETAILING 225 (2003).

[26] Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An Investigation Into the Effects of Advertised Reference Prices On the Price Consumers Are Willing To Pay For the Product*, 6 J. OF APP'D BUS. RES. 1 (1990).

[27] *Id.*

[28] Megan Tatum, *Bargain debasement: why are 'fake discounts' on the rise?*, Raconteur (June 23, 2023), available: https://www.raconteur.net/economy-trends/fake-discounts-online-retail.

[29] Grewal, *supra* note 8, at 54; see also Richard Thaler, *Mental Accounting and Consumer Choice*, MARKETING SCIENCE 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

CLASS ACTION COMPLAINT

that the listed former prices are the "regular" prices at which Defendants sell that product; that these are former prices that Defendants sold the product at before the discount was introduced, and that these are the prevailing prices at JC Penney and/or other nationwide retailers. Put another way, reasonable consumers reasonably believe that, prior to the supposedly time-limited sale, consumers had to pay the "regular" price to get the item and did not have the opportunity to get a discount from that "regular" price, through a sale or otherwise.

73.     Reasonable consumers would also expect that, if they purchase during the sale, they will receive an item for which the regular price and/or market value is the advertised regular price and that they will receive the advertised discount from the regular purchase price.

74.     Consumers, including Plaintiffs and putative Class members, paid a "price premium" for the products that they otherwise would not have paid if the reference prices that Defendants used were omitted from the product listings. Or consumers would not have purchased the products at all, and Defendants would not have been able to charge the prices they ultimately did.

75.     Consumers who are presented with sale prices or discounts are more likely to make the purchase. Research shows that more than 64% of online consumers wait to buy things until they go on sale. Nearly two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering or are undecided on making a purchase.[30] As such, the lure of getting an item at a discount impacts a consumer's decision as to whether to purchase a product or not.

76.     Accordingly, Defendants' advertisements harm consumers by inducing them to make purchases based on false information. In this same vein, Defendants' advertisements artificially increase consumer demand for Defendants' products, putting upward pressure on the prices that Defendants can charge for its products.

---

[30] Khalid Saleh, *How Discounts Affect Online Consumer Buying Behavior*, INVESP (June 16, 2024), available: https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/.

CLASS ACTION COMPLAINT

Consequently, Defendants can charge a price premium for their products that they would not be able to charge absent the misrepresentations about the former prices. Defendants' misrepresentations caused Plaintiffs to pay more for the products they purchased than they otherwise would have.

### G.    Defendants' Deceptive Pricing Practice Violates the Law

77.    The Federal Trade Commission Act ("FTCA") prohibits the pricing scheme employed by Defendants regardless of whether the product advertisements and representations use the words "regular," "original," or "former" price. Under 16 C.F.R. § 233.1(e):

> If the former price is set forth in the advertisement, ***whether accompanied or not*** by descriptive terminology such as "Regularly," "Usually," "Formerly," etc., the advertiser should make certain that the former price is not a fictitious one. If the former price, or the amount or percentage of reduction, is not stated in the advertisement, as when the ad merely states, "Sale," the advertiser must take care that the amount of reduction is not so insignificant as to be meaningless. It should be sufficiently large that the consumer, if he knew what it was, would believe that a genuine bargain or saving was being offered. An advertiser who claims that an item has been "Reduced to $9.99," when the former price was $10, is misleading the consumer, who will understand the claim to mean that a much greater, and not merely nominal, reduction was being offered.

78.    The FTCA also prohibits "unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a)(1). Under FTC regulations, false former pricing schemes like the ones employed by Defendants are deceptive practices that violate the FTCA.

79.    Pursuant to 16 C.F.R. § 233.1, entitled Former Price Comparisons:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the ***former***

*price* is the actual, bona fide price at which the article was offered to the public on a *regular basis* for a *reasonably substantial period of time*, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an *artificial, inflated price* was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. (Emphasis added).

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a *reasonably substantial period of time*, in the *recent*, regular course of her business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. (Emphasis added).

(c) The following is an example of a price comparison based on a fictitious former price. John Doe is a retailer of Brand X fountain pens, which cost him $5 each. His usual markup is 50 percent over cost; that is, his regular retail price is $7.50. In order subsequently to offer an unusual "bargain," Doe begins offering Brand X at $10 per pen. He realizes that he will be able to sell no, or very few, pens at this inflated price. But he doesn't care, for he maintains that price for only a few days. Then he "cuts" the price to its usual level—$7.50— and advertises: "Terrific Bargain: X Pens, Were $10, Now Only $7.50!" *This is obviously a false claim*. The advertised "bargain" is not genuine. (Emphasis added).

CLASS ACTION COMPLAINT

(d) Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he **never offered the article at all**; he might feature a price which was **not used in the regular course of business**, or which was **not used in the recent past** but at some **remote period in the past**, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was **not maintained for a reasonable length of time**, but was immediately reduced. (emphasis added).

80.    The FTCA also prohibits retailers from offering fake limited duration sales. *See* 16 C.F.R. §233.5 which provides:

[Retailers] should not represent that they are selling at "factory" prices when they are not selling at the prices paid by those purchasing directly from the manufacturer. . . . They should not offer an advance sale under circumstances where they do not in good faith expect to increase the price at a later date, or make a 'limited' offer which, in fact, is not limited.

81.    Plaintiffs Robinson and Skurauskis purchased their products online from their residences in California. Plaintiff Nelson purchased her product in a JC Penney store located in Concord, California. Defendants' pricing practices also violate California law. Section 17500 of California's False Advertising Law prohibits businesses from making statements they know or should know to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. This includes statements falsely suggesting that a product is on "sale," when it actually is not.

82.    Moreover, section 17501 of California's False Advertising Law specifically provides that "[n]o price shall be advertised as a former price . . . unless the alleged former price was the prevailing market price . . . within three months next immediately preceding" the advertisement. Cal. Bus. & Prof. Code § 17501.

83.    Further, California's Consumer Legal Remedies Act prohibits "advertising goods or services with the intent not to sell them as advertised" and specifically prohibits "false or misleading statements of fact concerning reasons for, existence of, or amounts

of price reductions." Cal. Civ. Code § 1770(a)(9), (13).

84. Additionally, California's unfair competition law bans unlawful, unfair, and deceptive business practices. Cal Bus. & Prof. Code § 17200.

85. As described herein, Defendants make false and misleading statements about their prices and discounts. Defendants advertise "regular" prices that are not actually their "regular" or former prices, and were not the prevailing market price in the three months immediately preceding the advertisements. Additionally, Defendants advertised goods or services with the intent not to sell them as advertised. For example, Defendants advertised that goods had certain former prices and/or market values even though they never intended to sell those goods at those former prices and/or market values. Defendants made false and/or misleading statements concerning the reasons for, existence of, and amounts of price reductions. Such false or misleading statements were made in the context of site-wide discounts, discounts on categories of items, and individual items. Defendants engaged in unlawful, unfair, and deceptive business practices by virtue of this deceptive pricing scheme.

### H. JC Penney Has a Repeated History of Engaging in this Fraudulent Pricing Scheme

86. JC Penney's conduct is not new or isolated. To the contrary, JC Penney has faced backlash for over a decade for engaging in nearly identical pricing schemes. Upon information and belief, in or around February 2012 JC Penney temporarily stopped using pricing comparison. This seemingly demonstrated an acknowledgement on the part of JC Penney that its misrepresentations of customer savings on transaction receipts with the words "*Your Total Savings Today*" was deceiving. Around this time was when JC Penney implemented a new pricing strategy known as "fair and square" by which it purported to offer products at everyday low prices. This ended up not being a profitable venture for JC Penney, as reports in the press showed a dip in revenues and profits for JC Penney.

87. Since the fair pricing strategy was not profitable for JC Penney, it deviated to its old ways in early 2013, reverting to displaying the false comparative price

advertising. This practice drew the scrutiny of consumer advocates and prompted several lawsuits against JC Penney, beginning around 2014. Upon information and belief, a total of four lawsuits were filed against JC Penney challenging the same deceitful pricing practices complained of herein. Indeed, in certifying the class in one such case, the court acknowledge the "crux of plaintiff's claims, i.e., that the false advertising was a 'scheme' that was 'rampant throughout California as part of a massive, years-long, pervasive campaign and was consistent across all of JC Penney's private branded and exclusive branded apparel and accessories." *Spann v. J.C. Penney Corp.*, No. 12-cv-0215 (C.D. Cal. May 18, 2015) (ECF No. 209).

88.    JC Penney later represented to the Federal District Court in *Spann* that it would cease engaging in such deceptive practices, by entering into a settlement agreement which promised: "JC Penney agrees that any former price to which JCPenney refers in its price comparison advertising will be the actual, bona fide price at which the item was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of business, honestly and in good faith."[31] Therein, JC Penney also represented that it had, in fact "implemented a new price-comparison advertising policy" as of November 2015.[32]

89.    Despite these public representations, JC Penney persisted in engaging in false pricing schemes designed to maximize its profits at the expense of unsuspecting consumers. Accordingly, JC Penney was the target of another lawsuit challenging the exact same practices in *The People of the State of California v. J.C. Penney Corp., Inc.*, BC 643036 (Cal. Super Dec. 8, 2016). The complaint in that case acknowledged JC Penney's settlement in *Spann*, pointing out the fact that JC Penney was continuing to engage in the very conduct that it publicly represented it had stopped.

90.    Further litigation still did not deter JC Penney's deceitful pricing practices.

_____

[31] *See Span v. J.C. Penney Corp., Inc.*, No. 12-cv-0215 (C.D. Cal. Nov. 10, 2015), Settlement Agreement (ECF No. 246-3), at pp. 14-15.

[32] *See Span*, at ECF No. 267 (J.C. Penney Response to Objection to Class Settlement), dated July 28, 2016.

CLASS ACTION COMPLAINT

In fact, following its involvement in *People v. J.C. Penney Corp.*, JC Penney was sued in a shareholder derivative action in 2018, alleging that JC Penney's directors "breached their fiduciary duty of loyalty by consciously disregarding their responsibility to oversee JC Penney's compliance with California laws governing price-comparison advertising." *Rojas v. J.C. Penney Co., Inc.*, No. 2018-0755 (Del. Ch. Ct. July 29, 2019), at 1. The central allegation in that case was that the directors "failed to ensure that the company abided by the terms of the *Spann* settlement."

91.     JC Penney still was not deterred. Just last year, JC Penney faced another lawsuit stemming from the exact same false reference pricing scheme that formed the basis of the earlier lawsuits. *See Carranza v. Old Copper Co., Inc. f/k/a J.C. Penney Co., Inc.*, No. 23-cv-0276 (S.D. Cal. Feb. 13, 2023) (ECF No. 1).

92.     Defendants are repeat bad actors. They continue to make their profits a priority by continuing to engage in deceptive and illegal pricing practices. Defendants have been the subject of litigation time and again for deceiving consumers with their false reference pricing scheme, and yet they continue these practices to this day.

93.     Even though JC Penney formerly represented that it had changed its pricing practices (*see Spann* Settlement Agreement), the allegations and evidence herein demonstrates that it is continuing to engage in the exact same conduct, demonstrating a blatant disregard for its prior commitments and the law.

## V.    CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action on behalf of themselves, and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seek certification of the following classes (collectively, the "Class"):

> **Nationwide Class:** All persons who purchased one or more items from JC Penney during the Class Period at a discount from an advertised higher reference price (the "Nationwide Class" or "Class").

> **California Subclass:** All persons in California who purchased one or more items from JC Penney during the Class Period at a discount from an advertised

1    higher reference price (the "California Subclass").

2    95.    Excluded from the Class are Defendants, as well as their officers, directors, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Also excluded from the Class are persons or entities that purchased products from Defendants for purposes of resale.

96.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues, and ending on the date of entry of judgment.[33]

97.    Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

98.    **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiffs allege that there are at least tens of thousands of members of the Class.

99.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class members because, inter alia, all Class members have been deceived (or were likely to be deceived) by Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

100.    **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs have retained attorneys who are experienced in the handling of complex consumer class

---

[33] The Class Period begins at minimum 4 years from the date of filing of this action, but based on tolling, may extend beyond that date.

action litigation, and Plaintiffs and their counsel intend to vigorously prosecute this action. Plaintiffs have no antagonistic or adverse interest to those of the Class.

101.  **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

A. Whether, during the Class Period, Defendants advertised false reference prices on products offered on the Website.

B. Whether, during the Class Period, the original price advertised by Defendants was the prevailing market price for the products in question during the three-month period preceding the dissemination and/or publication of the advertised former prices.

C. Whether, during the Class Period, Defendants advertised price discounts from false reference prices on products offered on the Website.

D. Whether the products listed on Defendants' Website during the Class Period were offered at their reference prices for any reasonably substantial period of time prior to being offered at prices that were discounted from their reference prices.

E. Whether Defendants' alleged conduct constitutes violations of the laws asserted.

F. Whether Defendants engaged in false or misleading advertising.

G. Whether Defendants' deceptive pricing scheme using false reference prices constitute an "unlawful," "unfair," or "fraudulent" business practice in violation of the California Unfair Competition Law, Cal. Bus & Prof. Code § 17200, et seq.

H. Whether Defendants' deceptive pricing scheme using false reference

prices constitutes false advertising in violation of the California False Advertising Law under Business & Professions Code § 17500, et seq.

I.  Whether Defendants' use of false reference prices on products offered on their Website during the Class Period was material.

J.  Whether Defendants had a duty to conspicuously disclose to customers that the reference prices were false former/regular prices.

K.  Whether the members of the Class are entitled to damages and/or restitution.

L.  Whether injunctive relief, including public injunctive relief, is appropriate and necessary to enjoin Defendants from continuing to engage in false or misleading advertising.

M.  Whether Defendants' conduct was undertaken with conscious disregard of the rights of the members of the Class and was done with fraud, oppression, and/or malice.

N.  Whether members of the Class are entitled to an award of reasonable attorneys' fees, interest, and costs of suit.

102.  **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an individual lawsuit would unreasonably consume the damages that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiffs anticipate no difficulty in the management of this

action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

103. **Substantial Similarity.** The products at issue in the action are substantially similar in all material respects. Namely, the products were all advertised with a false reference price, advertised with a strikethrough reference price, and advertised with a false sale price. The products are also all sold by Defendants on the Website and in-store and fall under the umbrella of apparel, home goods, jewelry, beauty products, and many other categories.

104. **Ascertainability.** Upon information and belief, Defendants keep extensive records of its customers through their online sales data, as well as through, inter alia, general marketing programs. Defendants have one or more databases through which all, or a significant majority of, Class members may be identified and ascertained, and they maintain contact information, including email and home address, through which notice of this action could be disseminated in accordance with due-process requirements.

## VI.  TOLLING OF THE STATUTE OF LIMITATIONS AND DELAYED DISCOVERY

105. All applicable statutes of limitations have been tolled by the delayed discovery doctrine. Plaintiffs and Class members could not have reasonably discovered Defendants' practice of running perpetual and/or extended sales, based on deceptive reference prices and deceptive sale prices, at any time prior to commencing this class action litigation.

106. A reasonable consumer viewing the Website on multiple occasions would simply believe that a product is on sale for the time period represented on the Website. Short of visiting and checking the Website for months continuously, or using an internet archival device, a reasonable consumer would not suspect that Defendants' sales and pricing practices were false and misleading. Nor would a reasonable consumer be able

to ascertain the market value of the products being sold absent extensive investigation, which reasonable consumers would not be on notice to have to do.

107. Plaintiffs did not learn of Defendants' deceptive practices alleged herein until commencing this action.

108. As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**FIRST CAUSE OF ACTION**
**FRAUD (INTENTIONAL MISREPRESENTATION AND OMISSION)**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the California Subclass)**

109. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

110. As alleged more fully above, Defendants made false or misleading statements of fact and material omissions concerning the existence of and the amounts of price reductions. These representations were false because: (a) Defendants falsely represent the products as on sale for limited time when in truth a new substantially equivalent sale is promptly instituted after the expiration of an existing sale; and (b) the false reference prices advertised in connection with products offered on the Website misled and continue to mislead customers into believing the products were previously sold on the Website at the higher reference prices on a regular basis for a reasonably substantial period of time. Defendants knew that these representations were false at the time that they made them and/or acted recklessly in making the misrepresentations.

111. Defendants had a duty to conspicuously disclose the truth about their pricing deception, including that the reference prices advertised on their Website and in-store were not prices at which Defendants' items were listed or sold on the Website in the recent past on a regular basis for a reasonably substantial period of time, and in truth, Defendants' products are typically not offered or sold on the Website (and/or in the marketplace) at the advertised reference prices. Reasonable consumers were likely to be deceived by Defendants' failure to disclose material information.

112. Defendants knew that the items Plaintiffs and the Class purchased had

rarely, if ever, been offered or sold on the Website at the substantially higher reference price in the recent past.

113.    Defendants' representations were made with the intent that Plaintiffs and the Class would rely on the false representations and spend money they otherwise would not have spent, purchase items they otherwise would not have purchased, and/or spend more money for an item than they otherwise would have absent the deceptive marketing scheme.

114.    Defendants' conduct was made with the intent to maximize its profits at the detriment of reasonable consumers.

115.    Defendants intended that Plaintiffs and the Class rely on these representations. Plaintiffs and the Class reasonably relied on Defendants' representations. Absent Defendants' misrepresentations, Plaintiffs and the Class would not have purchased the items they purchased from Defendants, or, at the very least, they would not have paid as much for the items as they ultimately did. Plaintiffs and the Class's reliance was a substantial factor in causing them harm.

116.    Had the omitted information been disclosed, Plaintiffs and the Class reasonably would have behaved differently. Among other things, they would not have purchased the items they purchased from Defendants or, at the very least, would not have paid as much for the items as they ultimately did.

117.    As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages because (a) they would not have purchased Defendants' products if they had known that the representations were false, and/or (b) they overpaid for the products because the products were sold at a price premium due to the misrepresentations.

118.    Plaintiffs and the Class are also entitled to punitive or exemplary damages. Defendants, through their senior executives and officers, undertook the illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, malice, and/or oppression. Based on the allegations above, Defendants' actions were fraudulent because Defendants intended to and did deceive

and injure Plaintiffs and the Class. Based on the allegations above, Defendants' conduct was made with malice because Defendants acted with the intent to and did cause injury to Plaintiffs and the Class, and because Defendants willfully and knowingly disregarded the rights of Plaintiffs and the Class.

<u>**SECOND CAUSE OF ACTION**</u>
**NEGLIGENT MISREPRESENTATION**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the California Subclass)**

119.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

120.    As alleged more fully herein, Defendants made false or misleading statements and/or material omissions of fact concerning the existence of and the amounts of price reductions because, as previously explained: (a) Defendants falsely represent the products as on sale for limited time when in truth a new substantially equivalent sale is promptly instituted after the expiration of an existing sale; and (b) the false reference prices advertised in connection with products misled and continue to mislead customers into believing the products were offered for sale and/or previously sold at the higher reference prices on a regular basis for a reasonably substantial period of time. When Defendants made these misrepresentations, they knew or should have known that they were false. Defendants had no reasonable grounds for believing that these representations were true when made.

121.    Defendants had a duty to conspicuously disclose the truth about its pricing deception, including that: (a) the reference prices advertised and published on the Website were not prices at which Defendants' items had been offered and/or sold on the Website or in Defendants' stores in the recent past on a regular basis for a reasonably substantial period of time; and (b) the expiration of any given sale would be followed by a substantially equivalent sale.

122.    Defendants knew their sales were falsely advertised as being of limited duration. Defendants also knew or should have known that the reference prices were not the prevailing market prices. And Defendants knew that the items Plaintiffs and the

- 33 -

Class purchased had rarely, if ever, been offered or sold on the Website at the substantially higher reference price in the recent past.

123.  Defendants had no good faith or reasonable basis to believe that their representations were true when made.

124.  Defendants' representations were made with the intent that Plaintiffs and the Class rely on the false representations and spend money they otherwise would not have spent, purchase items they otherwise would not have purchased, and/or spend more money for an item than they otherwise would have absent the deceptive marketing scheme.

125.  Class-wide reliance can be inferred because Defendants' misrepresentations were material, i.e. a reasonable consumer would consider them important in deciding whether to buy Defendants' products.

126.  Defendants' misrepresentations were a substantial factor and proximate cause in causing damage and losses to Plaintiffs and Class members.

127.  Defendants engaged in this fraud to the Plaintiffs and the Class's detriment to increase Defendants' own sales and profits.

128.  Plaintiffs and the Class reasonably relied on Defendants' representations. Absent Defendants' misrepresentations, Plaintiffs and the Class would not have purchased the items they purchased from Defendants, or, at the very least, they would not have paid as much for the items as they ultimately did. Plaintiffs and the Class's reliance was a substantial factor in causing them harm.

129.  Had the omitted information been disclosed, Plaintiffs and the Class reasonably would have behaved differently. Among other things, they would not have purchased the items they purchased from Defendants or, at the very least, would not have paid as much for the items as they did.

130.  As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages because (a) they would not have purchased Defendants' products if they had known that the representations were false, and/or (b) they overpaid for the products because the products were sold at a price premium due to the

misrepresentations.

## THIRD CAUSE OF ACTION
### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, et seq.)
### (On Behalf of Plaintiffs and the California Subclass)

131.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

132.   Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

133.   California Business and Professions Code section 17200 et seq., known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unfair or fraudulent business act or practice" as well as "unfair, deceptive, untrue or misleading advertising."

134.   Defendants have violated California's UCL by engaging in fraudulent, unfair and unlawful conduct (i.e. violating each of the three prongs of the UCL).

***Fraudulent***

135.   Under the UCL, a business act or practice is "fraudulent" or deceptive if it actually deceives or is likely to deceive members of the consuming public.

136.   Defendants' conduct as alleged above is likely to deceive reasonable consumers. As alleged in detail above, Defendants affirmatively misrepresented that their products were on sale by artificially representing much higher reference prices, or "strikethrough" prices which gave the illusion of a discount. Defendants' deceptive marketing gave consumers the false impression that their products were regularly listed or sold on the Website for a substantially higher price.

137.   Defendants had a duty to disclose the truth about their pricing deception, including that the reference prices advertised on its Website were not, in fact, prices at which Defendants' items were listed or sold on the Website in the recent past for a reasonably substantial period of time, but in truth, the products never (or rarely) were offered or sold at the reference prices. Reasonable consumers were likely to be deceived

CLASS ACTION COMPLAINT

by this material omission.

138. Defendants' conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing they are receiving a product that is worth more than it actually is, by presenting a fake sale price.

139. Defendants' representations were materially misleading to Plaintiffs and other reasonable consumers. Consumers are heavily influenced by price, including significant price reductions of purported limited duration, as employed by Defendants' high-pressure sales tactics.

140. Plaintiffs relied on Defendants' misleading representations and omissions, as detailed above, believing that they were receiving a genuine discount of limited duration from a prevailing and genuine regular and former price.

141. Absent Defendants' misrepresentations, Plaintiffs and the Class would not have purchased the items they purchased from Defendants, or, at minimum, they would not have paid as much for the items as they ultimately did. Plaintiffs and the Class's reliance was a substantial factor in causing them harm.

142. Had the omitted information been disclosed, Plaintiffs would have been aware of it and reasonably would have behaved differently. Among other things, Plaintiffs would not have purchased the items they purchased from Defendants, or, at minimum, would not have paid as much for the items as they did.

143. As a result of Defendants' fraudulent business acts and practices, Defendants have and continue to fraudulently obtain money from Plaintiffs and members of the Class.

***Unfairness***

144. Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

145. As alleged in detail above, Defendants committed "unfair" acts through their deceptive marketing tactics which gave consumers the false impression that their

products were regularly listed or sold on the Website for a substantially higher price in the recent past than they actually were and, thus, consumers were led to believe that Defendants' products were worth more than they were.

146.    Defendants violated established public policy by violating the CLRA, the FAL and the FTCA as alleged herein. The unfairness of this practice is tethered to a legislatively declared policy (i.e. that of the CLRA, the FAL, and the FTCA).

147.    The harm to Plaintiffs and the Class greatly outweighs the public utility of Defendants' conduct. There is no public utility to mispresenting the price of a consumer product.

148.    Defendants' conduct was and continues to be of no benefit to reasonable consumers. It is misleading, unfair, unlawful, and is injurious to consumers. It is also against public policy, as it harms fair competition. For example, the FTCA and implementing regulations prohibit advertising a former price "for the purpose of establishing a fictitious [] price on which a deceptive comparison might be based" (16 C.F.R. § 233.1) and prohibit "offer[ing] an advance sale under circumstances where they do not in good faith expect to increase the price at a later date" (16 C.F.R. § 233.5). Similarly, the Lanham Act prohibits "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 41 U.S.C. § 1125(a).

149.    Misleading consumer products only injures healthy competition and harms consumers. Defendants are luring sales away from sellers who compete fairly on price and do not promote false former prices and fake sales of limited duration.

150.    The harm to Plaintiffs and members of the California Subclass outweighs the utility of Defendants practices. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the unfair conduct described herein.

151.    As a result of Defendants' unfair business acts and practices, Defendants have and continue to unfairly obtain money from Plaintiffs and members of the proposed Class.

CLASS ACTION COMPLAINT

*Unlawful*

152.   A cause of action may be "unlawful" for purposes of the UCL if a practice violates another law. Such action borrows violations of other laws and treats these violations as unlawful practices independently actionable under the UCL.

153.   By engaging in false advertising, as well as the false, deceptive, and misleading conduct alleged above, Defendants engaged in unlawful business acts and practices in violation of the UCL, including violations of state and federal laws and regulations. Specifically, as detailed herein, Defendants violated 16 C.F.R. §§ 233.1 and 233.5, and California Business & Professions Code section 17501.

*    *    *

154.   Plaintiffs seek damages and, in the alternative, restitution. Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law.

155.   A legal remedy is not adequate because it is not as certain as an equitable remedy. The elements of Plaintiffs' equitable claims are different and do not require the same showings as Plaintiffs' legal claims.

156.   In the alternative to claims seeking remedies at law, Plaintiffs and Class members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendants' unlawful and unfair business practices. The legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937).

157.   Equitable claims may be tried by the court, whereas legal claims are tried by jury, and the need for a jury trial may result in delay and additional expense. A jury trial will take longer, and be more expensive, than a bench trial. Additionally, unlike damages, the Court has broad discretion to fashion equitable relief, which can be awarded in situations where the entitlement to damages may prove difficult. Thus, restitution would allow recovery even when normal consideration associated with

damages would not. Furthermore, the standard, showing, and necessary elements for a violation of the UCL "unlawful" and "unfair" prongs are different from those that govern legal claims.

158.   Plaintiffs, on behalf of themselves and the members of the Class, seek restitution and restitutionary disgorgement of all moneys received by Defendants through the conduct described above.

159.   Plaintiffs, on behalf of themselves and the members of the Class, seek a public injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including putting a stop to the deceptive advertisements and false reference prices in connection with the sale of products on the Website. Plaintiffs seek an injunction on behalf of themselves, the putative class of similarly situated California residents, and the general public, prohibiting Defendants from making material omissions and misrepresentations to the public about its deceptive pricing practices. Plaintiffs seek a public injunction requiring Defendants to notify the public at large about its deceptive pricing practices, including through corrective advertising. The public injunction is essential to eradicating Defendants' deceptive scheme. In the absence of an injunction, Defendants will remain free to continue to mislead unsuspecting members of the public about its pricing scheme, causing consumers to believe they are getting items at a discount or sale price, when, in reality, they are not.

160.   Plaintiffs and Class members are entitled to public injunctive relief. On information and belief, the dissemination of Defendants' false and misleading advertising is ongoing. The public injunctive relief will protect the public from JC Penney's deceitful marketing practices which misrepresent and omit material facts about Defendants' pricing practices.

## FOURTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### CAL. BUS. & PROF. CODE § 17500, et seq.
### (On Behalf of Plaintiffs and the California Subclass)

161.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs

- 39 -

as if fully set forth herein.

162.   Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

163.   Defendants have violated Sections 17500 and 17501 of the Business and Professions Code.

164.   The California False Advertising Law, codified at California Business & Professions Code section 17500, et seq. (the "FAL") provides that it is unlawful for any business, with intent directly or indirectly to dispose of personal property, to make or disseminate in any "manner or means whatever, including over the Internet, any statement, concerning that . . . personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]" Cal. Bus. & Prof. Code § 17500. The "intent" required by section 17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

165.   A separate section of the FAL, Cal Bus. & Prof. Code § 17501, provides:

> For the purpose of this article the worth or value of any ***thing advertised*** is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.
>
> No price shall be advertised as a ***former price*** of any advertised thing, unless the alleged former price was the ***prevailing market price*** as above defined within ***three months next immediately preceding*** the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement. (emphasis added)

166.   As used in Cal Bus. & Prof. Code § 17501:

CLASS ACTION COMPLAINT

The term "advertised thing" refers to the exact same product offered—***not*** an equivalent or similar product. *People v. Superior Ct.* (*J.C. Penney Corp.),* 34 Cal. App. 5th 376, 412 (2019) ("if the advertisement specifies a precise item—say, by reference to name, brand, or other distinctive features . . . the market and therefore the market price is potentially determined on the basis of sales of ***that item only****.*") (emphasis added).

The term "'former price' . . . includes but is not limited to the following words and phrases when used in connection with advertised prices; 'formerly—,' 'regularly—,' 'usually—,' 'originally—,' 'reduced from ___,' 'was ___ now ___,' '___% ***off****.'*" 4 Cal. Code Regs., § 1301 (emphasis added).

The term "prevailing market price" refers to the "retail [price] if the offer is at retail." Cal Bus. & Prof. Code § 17501. (emphasis added)

167.  Defendants have violated, and continue to violate, Section 17500 of the Business & Professions Code by disseminating untrue and misleading advertisements over the internet and in stores to Plaintiffs and members of the California Subclass.

168.  As explained above, Defendants regularly advertised false and misleading reference prices for the products offered for sale on the Website and in its stores, including to Plaintiffs and members of the California Subclass. Defendants do this by, for example, crossing out a higher price or by displaying a discount price next to the "regular" price. Reasonable consumers would understand prices denoted as "regular" prices from which time-limited discounts are calculated to denote a "former" price of that product, i.e. the prices that Defendants charged before the limited time discount or sale went into effect.

169.  Additionally, Defendants have violated, and continue to violate, Section 17501 of the Business & Professions Code by advertising former prices that were not the prevailing market price within three months immediately preceding the

advertisements.

170.   Defendants rarely, if ever, offered products on the Website at the reference prices within the three months immediately preceding the publication of the reference prices. Moreover, the reference prices shown were not the prevailing market prices for the products in the three months immediately preceding the publication, as demonstrated by a sampling of competitor's pricing of the same products.

171.   On information and belief, Defendants did not verify that the advertised reference prices were the prevailing market prices within the preceding three months. And Defendants' former price advertisements do not state clearly, exactly, and conspicuously when, if ever, the former prices prevailed. Defendants' advertisements do not indicate whether or when the purported former prices were ever offered at all.

172.   Defendants' deceptive marketing practice gave consumers the false impression that their products were regularly offered and sold for a substantially higher price in the recent past than they were and, thus, led to the false impression that Defendants' products were worth more than they were and were being offered at discounted rates.

173.   Defendants knew that its advertised reference prices for the products sold on its Website were untrue and/or misleading. Defendants knew that such products had rarely, if ever, been offered or sold on the Website or in store at the reference prices.

174.   Defendants' practices were intended to induce reliance, and Plaintiffs saw, read, and reasonably relied on the misrepresentations when purchasing JC Penney's products. Defendants' misrepresentations were a substantial factor in Plaintiffs' purchasing decisions.

175.   Additionally, Class-wide reliance can be inferred because Defendants' misrepresentations were material, i.e. a reasonable consumer would consider them important in deciding whether to buy Defendants' products.

176.   As a direct and proximate result of Defendants' misleading and false advertisements, Plaintiffs and members of the California Class have suffered injury in fact and have lost money. Plaintiffs request restitution and an injunction prohibiting

CLASS ACTION COMPLAINT

Defendants from continuing their false and misleading advertising practices in violation of California law in the future.

177.    Plaintiffs and California Subclass members are entitled to injunctive relief, including public injunctive relief. On information and belief, the dissemination of Defendants' false and misleading advertising is ongoing. Plaintiffs seek an injunction on behalf of themselves, the putative class of similar situated California residents, and the general public, prohibiting JC Penney from making material omissions and misrepresentations to the public about its deceptive pricing practices. Plaintiffs seek a public injunction requiring Defendants to notify the public at large about its deceptive pricing practices, including through corrective advertising. The public injunction is essential to eradicating Defendants' deceptive scheme. In the absence of an injunction, Defendants will remain free to continue to mislead unsuspecting members of the public about its pricing scheme, causing consumers to believe they are getting items at a discount or sale price, when, in reality, they are not.

178.    In the alternative to those claims seeking remedies at law, Plaintiffs and Class members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendants' unlawful and unfair business practices. The legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937). For example, equitable claims may be tried by the court, whereas legal claims are tried by jury, and the need for a jury trial may result in delay and additional expense. A jury trial will take longer and be more expensive than a bench trial. Additionally, unlike damages, the Court's has broad discretion to fashion equitable relief, which can be awarded in situations where the entitlement to damages may prove difficult. Thus, restitution would allow recovery even when normal consideration associated with damages would not. Furthermore, the standard, showing, and necessary elements for a violation of the FAL under Cal Bus. & Prof. Code § 17501 are different from those that govern legal claims.

///

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE CALIFORNIA**
**CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750, et seq.**
**(On Behalf of Plaintiffs and the California Subclass)**

179.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

180.  Plaintiffs bring this claim on behalf of themselves and members of the California Class.

181.  The Consumer Legal Remedies Act, Cal. Civ. Code sections 1750 *et seq.* (the "CLRA"), is a California consumer protection statute which allows plaintiffs to bring private civil actions for "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction . . . which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

182.  Plaintiffs and members of the California Subclass are "consumers" as defined in California Civil Code § 1761(d).

183.  The products purchased by Plaintiffs and the class are "goods" within the meaning of California Civil Code section 1761(a).

184.  Defendants' sale of products on the Website to Plaintiffs and the Class were "transactions" within the meaning of California Civil Code section 1761(e).

185.  Defendants violated and continue to violate the CLRA by engaging in the following practices prohibited by California Civil Code section 1770(a) in transactions with Plaintiffs and the Class which were intended to result in, and did result in, the sale of Defendants' products:

    A. Representing that goods do have characteristics they do not actually have (Cal. Civ. Code § 1770(a)(5));

    B. Misrepresenting that goods are of a particular standard, quality, or grade (Cal. Civ. Code § 1770(a)(7));

    C. Advertising goods or services with intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

    D. Making false or misleading statements of fact concerning reasons for,

existence of, or amounts of price reductions (Cal. Civ. Code § 1770(a)(13)).

186.    With regards to section 1770(a)(5), (7), and (9), Defendants advertised and represented products on the Website with the "intent not to sell" them as advertised and misrepresenting product characteristics and standard because: (a) the false reference prices advertised in connection with products offered on the Website misled and continue to mislead customers into believing (i) the merchandise was previously offered for sale and/or sold *on the Website* at the higher reference prices on a regular basis for a reasonably substantial period of time, and (ii) were valued in the market at the advertised "regular" price; and (b) Defendants falsely represent the products as on sale for limited time when in truth a new substantially equivalent sale is promptly instituted after the expiration of an existing sale.

187.    With respect to section 1770(a)(13), Defendants made false or misleading statements of fact concerning the "existence of" and the "amounts of price reductions" because: (a) no true price reductions existed in that Defendants' merchandise was rarely, if ever, offered for sale and/or sold at the higher reference prices, let alone on a regular basis for a reasonably substantial period of time; (b) the reference prices Defendants advertised in connection with its products were not prevailing market prices because, on information and belief, the products were not previously sold by Defendant at the reference prices for a reasonably substantial period of time; and (c) Defendants falsely represents the products as on sale for limited time when in truth a new substantially equivalent sale is promptly instituted after the expiration of an existing sale.

188.    Additionally, Defendants had a duty to conspicuously disclose the truth about their pricing deception, including that the reference prices advertised on the Website were not prices at which Defendants' items were listed or sold on the Website or in Defendant's stores in the recent past on a regular basis for a reasonably substantial period of time, and in truth, Defendants' products are typically not offered or sold on the Website (and/or in Defendant's stores) at the advertised reference prices. Defendants also failed to disclose that the expiration of any given sale would be followed by a

substantially equivalent sale.

189.  Defendants' representations were likely to deceive, and did deceive, Plaintiffs and reasonable consumers. Defendants knew or should have known through the exercise of reasonable care that these statements were false and misleading.

190.  Defendants' misrepresentations were intended to induce, and did induce, reliance. Plaintiffs saw, read, and reasonably relied on the misrepresentations when purchasing JC Penney's products.

191.  Defendants' misrepresentations were a substantial factor in Plaintiffs' purchasing decisions. Absent Defendants' misrepresentations, Plaintiffs and the Class would not have purchased the items they purchased from Defendants, or, at the very least, they would not have paid as much for the items as they did. Plaintiffs and the California Class's reliance was a substantial factor in causing them harm.

192.  Had the omitted information been disclosed, Plaintiffs and the California Class reasonably would have been aware of it and behaved differently. Among other things, Plaintiffs and the California Class would not have purchased the items they purchased from Defendants or, at the very least, would not have paid as much for the items as they did.

193.  Contemporaneous with the filing of this Complaint, Plaintiffs, through counsel, will provide notice to Defendants pursuant to Cal. Civ. Code § 1782(a) via certified mail. As the 30-day response period has not yet lapsed, Plaintiffs claim no damages pursuant to this count, but will timely amend this Complaint after expiration of the response period to seek money damages and punitive damages under the CLRA. At this time, Plaintiffs seek only injunctive or other equitable relief under the CLRA as described above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for following relief:

A. Certification of this case as a class action on behalf of the proposed

Class and any subclasses defined above, appointment of Plaintiffs as Class representatives, and appointment of their counsel as Class counsel;

B. An award to Plaintiffs and the proposed Class and subclasses of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits Defendants obtained from Plaintiffs and the proposed Class as a result of its unlawful, unfair and fraudulent business practices described herein;

C. An injunction, including public injunctive relief as described herein, ordering Defendants to cease the false advertising and unfair business practices complained of herein;

D. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct;

E. An award of nominal, punitive, and statutory damages where available;

F. Reasonable expenses and attorneys' fees;

G. Pre- and post-judgment interest, to the extent allowable; and

H. For such further relief that the Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury for all claims so triable.

Date: September 4, 2024                    Respectfully submitted,


*/s/Jonathan Shub*
Jonathan Shub  (SBN 237708)
Samantha E. Holbrook *(pro hac vice* forthcoming)
Andrea L. Bonner *(pro hac vice* forthcoming)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428

- 47 -

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (610) 477-8380
*jshub@shublawyers.com*
*sholbrook@shublawyers.com*
*abonner@shublawyers.com*

*Attorneys for Plaintiffs and the Class*

CLASS ACTION COMPLAINT